1
2
3
4
5
6
7

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VETH KEO, | No. CIV S-09-2019-CMK |
| Plaintiff, | |
| vs. | <u>MEMORANDUM OPINION AND ORDER</u> |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |
| _____/ | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. <u>See</u> 28 U.S.C. § 636(c).  Pending before the court are plaintiff's motion for summary judgment (Docs. 15 & 16) and defendant's cross-motion for summary judgment (Doc. 17).

/ / /

/ / /

/ / /

# I.  PROCEDURAL HISTORY

Plaintiff first applied for social security benefits on December 28, 2000.  The claim was denied following an administrative hearing held on June 12, 2002.  Plaintiff did not appeal.  Plaintiff applied again for social security benefits on March 21, 2007.  In the application, plaintiff claims that disability began on October 31, 2006.  Plaintiff claims that disability is caused by a combination of "depression memory loss, both knee pain, and back pain, head."  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on June 10, 2008, before Administrative Law Judge ("ALJ") Sandra K. Rogers.   In a September 29, 2008, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1.    The claimant has the following severe impairment: post-traumatic stress disorder;

2.    The claimant's impairment does not meet or medically equal an impairment listed in the regulations;

3.    The claimant retains the residual functional capacity to perform the full range of work at all exertional levels with the following non-exertional limitations: only simple repetitive tasks with only occasional public contact; and

4.    Based on the claimant's age, education, work experience, and residual functional capacity, the Medical-Vocational Guidelines direct a finding of not disabled.

After the Appeals Council declined review on May 28, 2009, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

May 12, 2007 – Plaintiff was evaluated by agency examining psychologist James A. Wakefield, Ph.D.  Dr. Wakefield reported the following background:

> Veth is a 50 year old Cambodian speaking woman who reports having depression, memory loss, pain in both knees, back pain, and headaches.  She has never attended school.  Veth worked as an in-home care provider, taking clients to doctors' appointments and visits, preparing food, and doing laundry.  She stopped working in February 2006.  She takes Ibuprofen, Metronidazole, and Trazodone.
>
> Veth reports that she takes unnamed medications for dizziness, tight nerves, poor sleep, and an infection.  During the day, she cooks if she is feeling well; otherwise, she stays in bed.  Veth was exposed to the war in Cambodia. . . .  Veth has friends, but she never goes to see them.

After conducting an examination, Dr. Wakefield offered the following summary and recommendations:

> Veth is a verbally fluent 50 year old Cambodian woman who reports having depression, memory loss, pain in both knees, back pain, headaches, and bad dreams, as well as exposure to wartime conditions and no schooling.  Her intellectual ability was measured in the deficient range, although her verbal fluency and her mature nonverbal behaviors suggested a high level of ability.  Since no record showing a developmental disability during childhood was available, Borderline intellectual functioning is provisionally diagnosed.  Veth shows some symptoms of post-traumatic stress but does not appear to have a psychotic disorder.

The doctor noted that he was unable to assign a GAF score "due to reduced effort."  He continued his summary as follows:

> Veth presents herself as not able to handle her own funds, although stronger ability in this area is suspected.  Veth's responses to the tests indicate that she can follow simple work rules, although her ability to follow more complex procedures could not be assessed due to reduced effort.  Veth is able to interact with co-workers, supervisors, and the public at a minimally acceptable level in her native language.  She is able to sit, stand, walk, move about, handle objects, hear, speak, and travel adequately, although reported pain may limit the duration of some of these activities.  Veth's ability to reason and make occupational, personal, and social decisions in her best interests is presented as deficient.  Her social and behavioral functioning were appropriate for her age and did not

1   suggest immaturity that would be consistent with the test results.  Veth's
2   concentration, persistence, and pace are presented as deficient, although
    stronger abilities are suspected.

3   <u>May 16, 2007</u> – Agency examining doctor Philip Seu, M.D,. performed a

4   comprehensive internal medicine evaluation.  Plaintiff reported the following history via an

5   interpreter:

6   The claimant reported that she has had headaches for approximately 3-4
    years.  She gets an average of 3-4 headaches a week.  They usually involve
7   her occipital region as well as the top of her scalp and the headaches are
    bilateral.  She does not have an aura.  She reported associated dizziness
8   and occasional nausea.  She denied vomiting or  photophobia.  She has
    seen a physician for this.  She has not had any specific testing done.  She
9   takes Tylenol which provides some relief.  She does not have a history of
    serious head trauma.  She has not had a CT scan of the had.  She has had
10  no hospitalizations or emergency room visits for these symptoms.  She has
    not suffered any falls or other injuries associated with these complaints.

11

12  As to daily activities, plaintiff reported that she is at home and takes care of several children.

13  She told the doctor she does basic housework such as cooking, cleaning, and laundry.  Following

14  his physical examination, the doctor reported that plaintiff's ability to sit/stand is unlimited.

15  Plaintiff does not require any assistive devices for ambulation.  Plaintiff's weight-bearing ability

16  is unlimited.  No postural limitations were presented, and plaintiff does not have any visual

17  manipulative, communicative, or environmental limitations.

18  <u>June 6, 2007</u> – Agency consultative psychiatrist D.R. Conte, M.D., completed a

19  mental residual functional capacity assessment.  The doctor concluded that plaintiff was

20  moderately limited in her ability to understand and remember detailed instructions, her ability to

21  carry out detailed instructions, her ability to work in coordination with or proximity to others,

22  ability to complete a normal workday and workweek without psychological disruptions, and her

23  ability to interact appropriately with the general public.  In all other areas, plaintiff was assessed

24  as not significantly limited.  In notes appended to the assessment forms, Dr. Conte stated that the

25  medical evidence of record does not support plaintiff's claim of memory loss and that the body of

26  evidence supports the conclusion that plaintiff can perform simple, repetitive tasks.

1        <u>August 21, 2007</u> – Plaintiff, through her son as translator, submitted a function

2  report as part of her current application.  Plaintiff stated that she spent a typical day at home most

3  of the time watching television "or sitting on back porch depressed most of the time."  Plaintiff

4  reported that she cannot forget about her family being killed and that she is afraid all the time.

5  Plaintiff also stated that she has difficulty sleeping because she has frequent nightmares and

6  afterwards is upset and cannot go back to sleep.  Plaintiff stated that when she is severely

7  depressed she needs assistance bathing and dressing.  As to other activities of daily personal care,

8  plaintiff did not state she needed assistance.  As to meals, she stated her son "take care of

9  everything for her."  Similarly, she stated that her son does all the house and yard work.  Plaintiff

10  stated she is unable to shop alone and when she does shop it is only two or three times a month.

11  She stated she is unable to handle paying bills, counting change, handling a savings account, or

12  using a checkbook.  Plaintiff stated her inability to handle finances was due to loss of

13  concentration and memory.  Plaintiff stated she is not dependable.  As to social activities,

14  plaintiff stated that she does not spend any time with others and most of the time sits alone in her

15  room.

16        <u>August 21, 2007</u> – Plaintiff's son Chetakna Chou submitted an adult function

17  report regarding plaintiff's abilities.  The statement is essentially the same as the August 21,

18  2002, function report submitted by plaintiff.

19        <u>August 29, 2007</u> – Agency consultative doctor S.P. Amon, M.D., completed a

20  physical residual functional capacity assessment.  The doctor opined that plaintiff could

21  occasionally lift 20 pounds and frequently lift 10 pounds.  Plaintiff could sit/stand/walk for about

22  six hours in an eight-hour day.  Plaintiff's ability to push/pull is unlimited.  No postural,

23  manipulative, visual, communicative, or environmental limitations were noted.

24  ///

25  ///

26  ///

1          May 28, 2008 – Plaintiff's attorney submitted a psychiatric evaluation prepared by

2  Les P. Kalman M.D.  Plaintiff reported the following history via an interpreter:

3          Patient states that she's constantly experiencing headaches and dizziness
           and is tired.  She is also depressed, most recently about her son who may
4          be involved with gangs.  There was a drive-by shooting in July of last year.
           Patient states that she is constantly worrying about her family.  She had
5          nightmares and flashbacks to this episode.  In addition, patient states that a
           couple of years ago her husband left her which is another source of
6          depression for her.  She experienced traumas while living in Cambodia
           during the Khmer Rouge regime.  Her parents and brother were killed.
7          Patient began crying.  She states that she was in a slave camp for about six
           months until liberated by the Vietnamese in 1979.  Patient does admit to
8          experiencing nightmares and flashbacks to these experiences.  She
           described one of the nightmares as the Khmer Rouge coming after her
9          trying to kill her.  She states she has been having those kind of nightmares
           for over 20 years.  She also described feeling depressed because of all the
10         events that have occurred, including feelings of hopelessness,
           helplessness, worthlessness, greatly diminished energy, no motivation,
11         suicidal thoughts.

12  As to daily activities, plaintiff reported that her children do all the house work and shopping, she

13  does not manage funds, but she is able to care for her own personal hygiene needs.  Dr. Kalman

14  diagnosed post-traumatic stress disorder and assigned a GAF score of 50.  He also diagnosed

15  borderline intellectual functioning.  Dr. Kalman opined that plaintiff's condition is not expected

16  to improve in the next 12 months.

17          Dr. Kalman also submitted a medical source statement concerning plaintiff's

18  mental functioning.  He opined that plaintiff is moderately limited in her ability to remember

19  locations and work-like procedures.  The doctor also found that plaintiff is moderately limited in

20  her ability to maintain attention and concentration for extended periods, ability to make simple

21  work-related decisions, ability to complete a normal workday or workweek without

22  psychological distractions, and ability to accept instructions.  Plaintiff was assessed as markedly

23  limited in her ability to understand and remember detailed instructions, and her ability to carry

24  out detailed instructions.  In all other areas plaintiff was either not limited or only mildly limited.

25  Dr. Kalman also stated that the following work-related stressors could exacerbate plaintiff's

26  limitations: unruly demanding customers, production demands or quotas, demands for precision,

1   and the need to make fast and accurate decisions.  Dr. Kalman opined that a routine, repetitive,

2   simple, entry-level job would mitigate psychological symptoms in the workplace.  The doctor

3   stated that plaintiff's impairment has existed at the assessed severity since the 1980s.

4

5                           **III.  STANDARD OF REVIEW**

6                  The court reviews the Commissioner's final decision to determine whether it is:

7   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

8   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

9   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

10  (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

11  support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

12  including both the evidence that supports and detracts from the Commissioner's conclusion, must

13  be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

14  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

15  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

16  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

17  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

18  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

19  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

20  which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

21  Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

22  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

23  Cir. 1988).

24  / / /

25  / / /

26  / / /

# IV.  DISCUSSION

In her motion for summary judgment, plaintiff argues that the ALJ failed to provide adequate reasons for rejecting part or all of the opinions of Drs. Kalman, Wakefield, and Conte.  Plaintiff also argues that the ALJ erred by failing to obtain vocational expert testimony on the effects of plaintiff's non-exertional limitations on the job base.  Finally, while plaintiff states that she does not offer a separate argument as to the ALJ's adverse credibility finding, plaintiff nonetheless challenges that finding as "premised on erroneous findings of fact and law as to the medical opinions of record."

### A.    Evaluation of Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

1  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

2  81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

3  the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

4  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

5  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

6  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

7  without other evidence, is insufficient to reject the opinion of a treating or examining

8  professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

9  conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

10  1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

11  see also Magallanes, 881 F.2d at 751.

12       Plaintiff argues: (1) the ALJ erred in rejecting all of Dr. Kalman's assessed

13  limitations; (2) the ALJ did not state adequate reasons for rejecting Dr. Wakefield's assessment

14  that plaintiff has borderline intellectual functioning, was not competent to handle funds, and that

15  plaintiff would be limited to working with co-workers, supervisors, and the public in her native

16  language only; and (3) the ALJ did not state adequate reasons for rejecting Dr. Conte's opinion

17  that plaintiff is limited in her ability to work in coordination with others, complete a normal

18  workday without distractions, and perform at a consistent pace without an unreasonable number

19  and length of rest periods.

20       1.   Dr. Kalman

21  As to Dr. Kalman, the ALJ stated:

22  A Psychiatric Evaluation Report concerning the claimant was prepared by
    Les Kalman, M.D., and dated June 1, 2008 (Exhibit B12F).  The
23  claimant's chief complaints were of headache, dizziness, and fatigue
    (Exhibit B12F2).  She described a typical day as laying on the bed and
24  watching television (Exhibit B12F4).  It was noted that the claimant
    presented with depression and dysphoric mood related to past experiences,
25  specifically past traumas (Exhibit B12F4).  She was given an Axis I
    diagnosis of post traumatic stress disorder and assigned a GAF of 50
26  (Exhibit B12F5).  I give reduced weight to these findings and they are not

1              consistent with the claimant's medical records, are based totally on the
subjective report of the claimant, were not confirmed with objective

2              testing and are, therefore, too restrictive.

3   Here, the ALJ rejected Dr. Kalman's opinions primarily because they were not based on

4   objective evidence.  As discussed above, this is a legitimate reason for rejecting any doctor's

5   opinion.  The court also finds that this reason is supported by the record as a whole.  It appears

6   that the only objective evidence cited by Dr. Kalman was plaintiff's responses to his questions

7   and the other medical evidence of record already discussed herein, specifically Dr. Wakefield's

8   report.  Dr. Kalman does not appear to have conducted any kind of comprehensive psychological

9   evaluation or testing.

10           Moreover, as the ALJ noted, the restrictions assessed by Dr. Kalman are

11   inconsistent with the medical record as a whole.  For example, there is no evidence that plaintiff

12   was ever hospitalized for mental problems, or that she sought mental health treatment.  The court

13   also notes that Dr. Kalman appears to have opined that plaintiff could in fact perform a routine,

14   simple, entry-level job.  In his statement, Dr. Kalman checked the box next to "No" for the

15   following question: "This individual is the type of person for whom a routine, repetitive, simple,

16   entry-level job would serve as a stressor which would *exacerbate* instead of mitigate

17   psychological symptoms in the workplace." (emphasis in original).  Thus, Dr. Kalman opined

18   that simple, routine work would mitigate plaintiff's psychological symptoms, suggesting that she

19   can in fact perform such work as the ALJ concluded.

20           Dr. Kalman's opinions are also suspect because he states that plaintiff's

21   limitations have existed since the 1980s at the assessed severity.  However, plaintiff herself states

22   in the current application that she only became disabled due to her symptoms in October 2006 –

23   not the 1980s.  Given that there are no medical records from the 1980s or after until 2007, it

24   appears that this conclusion was based entirely on plaintiff's subjective complaints, specifically

25   her recounting of events in Cambodia.

26   / / /

      2.    <u>Dr. Wakefield</u>

As to Dr. Wakefield, the ALJ outlined the doctor's findings and concluded: "I give great weight to these findings because they are the product of in-person psychological testing."   Plaintiff argues that the ALJ erred by not stating reasons for rejecting Dr. Wakefield's assessment that plaintiff has borderline intellectual functioning, was not competent to handle funds, and that plaintiff would be limited to working with co-workers, supervisors, and the public in her native language only.  As to plaintiff's ability to handle funds, the court does not find that Dr. Wakefield specifically opined that plaintiff lacked this ability.  While Dr. Wakefield stated that plaintiff "presents herself" as not able to manage funds, the doctor also stated that he suspected a stronger ability.  Thus, any indication in Dr. Wakefield's report regarding an inability to handle funds is based entirely on plaintiff's subjective presentation to the doctor and not on any objective evidence noted by Dr. Wakefield.  Further, as defendants correctly notes, the ability to handle funds is not properly part of the residual functional capacity assessment but is noted for administrative purposes in determining whether a social security claimant requires a representative to handle funds.  <u>See</u> 20 C.F.R. § 416.945(a)(4), (b), (c).

As to Dr. Wakefield's mention of a diagnosis of borderline personality disorder, the court notes that such diagnosis was made provisionally only because the doctor had no records indicating any developmental deficits.  The court must agree with defendant that "a 'provisional' diagnosis is not the same thing as a diagnosis and, in any event, the mere diagnosis of a condition is not proof of disability, nor it is helpful in the RFC evaluation."  <u>See</u> <u>Matthews v. Shalala</u>, 10 F.3d 678, 680 (9th Cir. 1993); <u>see also</u> 20 C.F.R. § 416.945(a)(4).

As to Dr. Wakefield's statement that plaintiff would be limited to work with others in her native language only, the court finds that this limitation was accounted for by the ALJ.  The ALJ accepted Dr. Wakefield's report and concluded that plaintiff retained the capacity to perform the full range of unskilled work.  According to the regulations, unskilled work primarily encompasses working with things rather than data and people.  Thus, any limitation on

the ability to work with others based on language difficulties is necessarily subsumed in the

finding that plaintiff can perform the full range of unskilled work, which does not primarily

involve interaction with people.  It is noted that Dr. Wakefield concluded that, despite plaintiff's

language difficulties, plaintiff could understand and follow simple instructions, which is

consistent with the ability to perform unskilled work.

> 3.   Dr. Conte

> As to Dr. Conte, the ALJ stated:

> A Mental Residual Functional Capacity Assessment of the claimant was
> completed by D.R. Conte, M.D., and dated June 6, 2007 (Exhibit B6F).  It
> found that the claimant's understanding and memory, sustained
> concentration and persistence, and social interaction were not significantly
> to moderately limited.  Her adaptation ability was not significantly limited.
> Dr. Conte also prepared a Psychiatric Review Technique that was dated
> June 6, 2007 (Exhibit B5F) which indicated that the claimant had anxiety-
> related disorders (Exhibit B5F1).  These disorders caused mild restriction
> of activities of daily living, moderate difficulties in maintaining social
> functioning, and moderate difficulties in maintaining concentration,
> persistence, or pace (Exhibit B5F9).  There were no repeated episodes of
> decompensation, each of extended duration.  I gave substantial weight to
> these findings because Dr. Conte is a specialist in psychiatry and has
> provided detailed annotations.

While the ALJ gave significant weight to Dr. Conte's opinions, plaintiff argues that the ALJ

erred by not providing reasons for rejecting Dr. Conte's opinion that plaintiff is limited in her

ability to work in coordination with others, complete a normal workday without distractions, and

perform at a consistent pace without an unreasonable number and length of rest periods.

The court does not find that the ALJ improperly rejected any opinion provided by

Dr. Conte.  While the doctor checked boxes on a form indicating that plaintiff has some moderate

limitations, Dr. Conte appended the form with detailed notes.  These notes reflect the doctor's

opinion that, notwithstanding these moderate limitations, plaintiff can perform simple, repetitive

tasks.  This opinion is consistent with the ALJ's residual functional capacity assessment.

/ / /

/ / /

1      **B.      <u>Plaintiff's Credibility</u>**

2              The Commissioner determines whether a disability applicant is credible, and the

3      court defers to the Commissioner's discretion if the Commissioner used the proper process and

4      provided proper reasons.  <u>See</u> <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

5      credibility finding must be supported by specific, cogent reasons.  <u>See</u> <u>Rashad v. Sullivan</u>, 903

6      F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  <u>See</u> <u>Lester v. Chater</u>, 81 F.3d

7      821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

8      and what evidence undermines the testimony.  <u>See</u> <u>id.</u>  Moreover, unless there is affirmative

9      evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

10     credible must be "clear and convincing."  <u>See</u> <u>id.</u>; <u>see also</u> <u>Carmickle v. Commissioner</u>, 533 F.3d

11     1155, 1160 (9th Cir. 2008) (citing <u>Lingenfelter v Astrue</u>, 504 F.3d 1028, 1936 (9th Cir. 2007),

12     and <u>Gregor v. Barnhart</u>, 464 F.3d 968, 972 (9th Cir. 2006)).

13             If there is objective medical evidence of an underlying impairment, the

14     Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

15     because they are unsupported by objective medical evidence.  <u>See</u> <u>Bunnell v. Sullivan</u>, 947 F.2d

16     341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in <u>Smolen v. Chater</u>:

17                     The claimant need not produce objective medical evidence of the
                [symptom] itself, or the severity thereof.  Nor must the claimant produce
18              objective medical evidence of the causal relationship between the
                medically determinable impairment and the symptom.  By requiring that
19              the medical impairment "could reasonably be expected to produce" pain or
                another symptom, the <u>Cotton</u> test requires only that the causal relationship
20              be a reasonable inference, not a medically proven phenomenon.

21             80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
                <u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986)).

22

23             The Commissioner may, however, consider the nature of the symptoms alleged,

24     including aggravating factors, medication, treatment, and functional restrictions.  <u>See</u> <u>Bunnell</u>,

25     947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

26     claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

                                        13

1   testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

2   prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

3   physician and third-party testimony about the nature, severity, and effect of symptoms.  See

4   Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

5   claimant cooperated during physical examinations or provided conflicting statements concerning

6   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

7   claimant testifies as to symptoms greater than would normally be produced by a given

8   impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

9   Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

10          Regarding plaintiff's credibility, the ALJ stated:

11          According to a Disability Report – Adult, the claimant's ability to work is
            limited by depression, memory loss, pain in both knees, and head and back
12          pain (Exhibit B3E2).  The claimant testified that she experiences problems
            with headaches, dizziness, memory, anxiety, depression, her knee, and her
13          back.

14          A Function Report – Adult – Third Party was filled out by the claimant's
            son (Exhibit B8E1).  It described the claimant as staying home most of the
15          time and sometimes watching televisions (Exhibit B8E1, see also B7E1).
            The claimant has difficulty concentrating and needs reminders (Exhibit
16          B8E3, see also B7E3).  She never goes shopping by herself (Exhibit B8E4,
            see also B7E4).
17
            The claimant's statements and those of third parties concerning the
18          claimant's impairments and their impact on the claimant's ability to work
            are not credible in light of discrepancies between the claimant's assertions
19          and information contained in the documentary reports and the reports of
            the treating and examining practitioners.  Although I do not find the
20          claimant at all times symptom free, the evidence does not support the
            degree of limitation the claimant alleges.
21
            Although the claimant has described daily activities which are fairly
22          limited, two factors weigh against considering these allegations to be
            strong evidence in favor of finding the claimant disabled.  First, allegedly
23          limited daily activities cannot be objectively verified with any reasonable
            degree of certainty.  Secondly, even if the claimant's daily activities are
24          truly as limited as alleged, it is difficult to attribute that degree of
            limitation to the claimant's medical condition, as opposed to other reasons,
25          in view of the relatively weak medical evidence and other factors
            discussed in this decision.
26

1    The claimant has not generally received on-going and continuous medical
2    treatment of the type one would expect for a totally disabled individual
     and the claimant's alleged loss of function is not supported by objective
3    medical findings.  I also note that some of the claimant's subjective
     symptoms are unsupported by objective medical evidence.

4    Another factor influencing the conclusions reached in this decision is the
     claimant's generally unpersuasive appearance, presentation, and demeanor
5    while testifying at the hearing.  It is emphasized that this observation is
     only one among many being relied on in reaching a conclusion regarding
6    the credibility of the claimant's allegations and the claimant's residual
     functional capacity and not determinative.

7

8    As indicated above, plaintiff does not offer any separate discussion of the ALJ's adverse

9    credibility finding but nonetheless challenges the finding.  The court finds no error in the ALJ's

10   analysis.  In particular, the court finds that the ALJ properly noted inconsistencies in the record

11   as a basis to disbelieve plaintiff's testimony.  For example, plaintiff told Dr. Seu in May 2007

12   that she cares for several children, does housework, and cooks.  However, both plaintiff and her

13   son reported in August 2007 that plaintiff cannot do anything, that her son does all the house

14   chores and shopping, and that she depends on her son for everything.  This inconsistency alone

15   justified the ALJ's adverse credibility finding.

16   **C.     Application of the Grids**

17          The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

18   disability for various combinations of age, education, previous work experience, and residual

19   functional capacity.  The Grids allow the Commissioner to streamline the administrative process

20   and encourage uniform treatment of claims based on the number of jobs in the national economy

21   for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

22   460-62 (1983) (discussing creation and purpose of the Grids).

23          The Commissioner may apply the Grids in lieu of taking the testimony of a

24   vocational expert only when the Grids accurately and completely describe the claimant's abilities

25   and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

26   Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

1    Grids if a claimant suffers from non-exertional limitations because the Grids are based on

2    exertional strength factors only.[1]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

3    "If a claimant has an impairment that limits his or her ability to work without directly affecting

4    his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

5    by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

6    Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

7    even when a claimant has combined exertional and non-exertional limitations, if non-exertional

8    limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

9    1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

10            In cases where the Grids are not fully applicable, the ALJ may meet his burden

11    under step five of the sequential analysis by propounding to a vocational expert hypothetical

12    questions based on medical assumptions, supported by substantial evidence, that reflect all the

13    plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

14    where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

15    ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

16    1341 (9th Cir. 1988).

17    _____

18            [1]     Exertional capabilities are the primary strength activities of sitting, standing,
       walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
19    perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
       P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
20    and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20
       C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at
21    a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§
       404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
22    with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§
       404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
23    with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§
       404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
24    100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
       See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
25            Non-exertional activities include mental, sensory, postural, manipulative, and
       environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R.,
26    Part 404, Subpart P, Appendix 2, § 200.00(e).

1    Regarding application of the Grids, the ALJ stated:

2        The claimant's ability to perform work at all exertional levels has been
         compromised by non-exertional limitations.  However, these limitations
3        have little or no effect on the occupational base of unskilled work at all
         exertional levels. . . .
4

5    As to limitations to public contact in particular, the ALJ cited Social Security ruling as well as

6    the Dictionary of Occupational Titles for the proposition that "relatively few simple, repetitive,

7    unskilled occupations require an employee to have more than occasional public contact

8    throughout the workday."  For this reason, the ALJ concluded that "the occupational base at all

9    levels is also not significantly eroded by the claimant's limitation to occasional public contact."

10            Plaintiff argues that the ALJ failed to properly account for her non-exertional

11   limitations of: (1) limited public contact; and (2) only simple, repetitive tasks.  As stated above,

12   the ALJ may rely on the Grids even where non-exertional limitations exist if such limitations do

13   not significantly limit the range of work permitted by the plaintiff's exertional limitations.  Here,

14   the ALJ concluded that plaintiff does not have any exertional limitations and can perform work at

15   all exertional levels.  Plaintiff does not challenge this finding.  The question is whether plaintiff's

16   non-exertional limitations significantly impact plaintiff's ability to do work at all exertion levels.

17            The court agrees with the ALJ that they do not.  The weight of the medical

18   evidence indicates that, notwithstanding non-exertional limitations, plaintiff can still perform

19   unskilled work at all exertion levels.  Even Dr. Kalman appears to agree that plaintiff can

20   perform simple, repetitive work despite the non-exertional limitations to which he opined.

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

17

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Docs. 15 & 16) is denied;

2. Defendant's cross-motion for summary judgment (Doc. 17) is granted; and

3. The Clerk of the Court is directed to enter judgment and close this file.

DATED:  November 23, 2010

CRAIG M. KELLISON
UNITED STATES MAGISTRATE JUDGE